```
 1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF KENTUCKY
 2                         LOUISVILLE DIVISION

 3
     UNITED STATES OF AMERICA,      )    Case No. 3:24-CR-00026-DJH
 4                                  )
             Plaintiff,             )
 5                                  )
     v.                             )
 6                                  )
     JORDAN A. FAUTZ,               )
 7                                  )    March 21, 2025
             Defendant.             )    Louisville, Kentucky
 8

 9                          *  *  *  *  *

10                    TRANSCRIPT OF SENTENCING
                   BEFORE HONORABLE DAVID J. HALE
11                  UNITED STATES DISTRICT JUDGE

12                          *  *  *  *  *

13   APPEARANCES:

14   For United States:      A. Spencer McKiness
                             U.S. Attorney's Office
15                           717 West Broadway
                             Louisville, KY 40202
16
     For Defendant:          Frank Mascagni III
17                           228 South Seventh Street
                             Louisville, KY 40202
18


19
     [Defendant present.]
20

21
                         Dena Legg, RDR, CRR, CCR-KY
22                         Official Court Reporter
                            208 U.S. Courthouse
23                         Louisville, KY 40202
                             (502) 625-3778
24
     Proceedings recorded by certified stenographer, transcript
25   produced by computer.
```

1      (Begin proceedings in open court at 2:17 p.m.)

2              DEPUTY CLERK:  3:24-CR-26, United States of America v.

3      Fautz.

4              MR. MCKINESS:  Good afternoon, Your Honor.  Spencer

5      McKiness here for the United States.

6              MR. MASCAGNI:  Good afternoon, Judge.  Frank Mascagni,

7      retained counsel for Mr. Jordan Fautz, present in custody,

8      standing to my left.

9              THE COURT:  This matter is on the docket for a

10     sentencing hearing.  Mr. Mascagni, have you and Mr. Fautz

11     received and reviewed the Revised Presentence Investigation

12     Report?

13             MR. MASCAGNI:  We have.

14             THE COURT:  Mr. Fautz, have you had enough time to go

15     through the PSR with Mr. Mascagni?

16             THE DEFENDANT:  Yes, sir.

17             THE COURT:  I presume, Mr. McKiness, the Government

18     has made the required disclosures regarding this hearing.

19             MR. MCKINESS:  Yes, sir.

20             THE COURT:  Do we have any objections to the PSR to

21     take up?

22             MR. MCKINESS:  None from the United States.

23             MR. MASCAGNI:  None for the defense, Your Honor.

24             THE COURT:  Let's begin then with a discussion of the

25     sentencing guideline calculations that are contained in the PSR.

1   They begin on page 10 in paragraph 30.  We have seven charges

2   here, and as is noted in paragraph 31, Counts 1 through 7 are

3   grouped for calculation purposes.  The base offense level is

4   found in Guideline 2G2.2.  The level there is 22.

5       Paragraph 33 notes that the offense conduct here included

6   images of minors as young as six years old, in addition to at

7   least one image involving an infant or toddler.  And thus, under

8   Guideline 2G2.2(b)(2), two levels are added to that calculation.

9       Paragraph 34 notes that the uploaded images of child

10  pornography using an app and distributed to the undercover

11  officer here add two levels under Guideline 2G2.2(b)(3)(F).

12      Paragraph 35 applies a four-level increase because the

13  results of a forensic examination of the defendant's electronic

14  devices revealed images containing bondage and at least one

15  image involving infants or toddlers.

16      Paragraph 36 adds two further levels.  As the offense

17  involved the use of a computer as well as a cellular device, two

18  levels are added.

19      Paragraph 37 adds five levels, and that's based on the

20  guideline provision which assesses the number of images

21  involved.  Here at least 789 images were distributed.

22      Paragraph 39 adjusts the guideline calculation up another

23  two levels after concluding that the defendant abused a position

24  of trust based upon his work as a teacher at the school where he

25  accessed images of students and faculty.  The adjusted offense

level there is 39 before the application of the acceptance of responsibility credits.

I presume now, Mr. McKiness, that as is noted in paragraph 44, the Government would move for that third level of credit under Guideline 3E1.1(b).

MR. MCKINESS:  That is correct, Your Honor.

THE COURT:  And so that results in a total offense level of 36.

The defendant's criminal history scores in Category I.  And so when we apply a total offense level of 36 to a Criminal History Category I, the guidelines make the following recommendations:

With respect to a sentence of imprisonment, the guidelines recommend a sentence of between 188 and 235 months.  With respect to supervised release, the guidelines recommend between five years and life and with respect to a fine of between 40,000 and 400,000.

Mr. McKiness, Mr. Mascagni, have I recited the guideline calculations correctly as they're found in our PSR?

MR. MCKINESS:  Yes, sir.

MR. MASCAGNI:  Yes, sir.

THE COURT:  In the absence of any further objections to the PSR, I will note for the record that it will be adopted and will remain sealed in the record.  In the event of an appeal, the parties, Court, and counsel will, of course, have

1   access to it.

2        The parties have a Rule 11(c)(1)(C) Plea Agreement which

3   calls for a sentence of 235 months.  That's at the upper end of

4   the applicable guideline range.  Is there anything that the

5   United States wishes to present to the Court in the context of

6   our discussion of the sentencing factors set out by Congress in

7   Title 18 of the U.S. Code, Section 3553(a)?

8        MR. MCKINESS:  In terms of arguing the 3553(a)

9   factors, the United States, as the Court is well aware,

10  submitted a sentencing memorandum which largely set out the

11  United States' arguments regarding the 3553(a) factors.

12       Obviously, this is a high-end guideline sentence that the

13  parties have agreed to.  Neither party has objected to the

14  guidelines or moved for a departure or variance of any kind.

15       The Government incorporates by reference the arguments that

16  were made in the sentencing memorandum and asks the Court to

17  accept the parties' Plea Agreement and sentence Mr. Fautz to

18  235 months, followed by a lifetime term of supervised release.

19       The parties do not have an agreement on the supervised

20  release term.  The United States believes that that sentence of

21  235 months and a lifetime term of supervised release is the best

22  way to punish Mr. Fautz for his criminal actions, protect the

23  public from future crimes from the defendant, and reflect the

24  seriousness of his crimes.

25       You know, Mr. Fautz here was a child pornography collector

and creator.  He used sophisticated AI tools to -- and morphing

technology to affix the heads of victims onto the bodies of

sexually explicit conduct.  He used those technologies to erase

clothes from otherwise benign photographs to make them appear

lewd.  And as the Court noted, there was possession of over 700

of those images.  That's including both known child pornography

series that have been trafficked before and the images that were

created on his devices of local victims.

And as I stated in my sentencing memorandum, more than a few

victims and their families would love to see Mr. Fautz in prison

for the rest of his life.  Despite this, the Government

acknowledges that other defendants with similar guideline

ranges -- or similar guideline offense levels for similar crimes

have received sentences in the average of 160 -- 136 months, but

a 235-month sentence is not excessive in this case considering

the large number of victims, the way that the crimes were

committed, and the exposure of a lot of the victims' true

identities and names that are exposed to strangers online.

I think those factors move it from what would be an average

case to one where the parties are asking for a high-end

guideline sentence.  And so, you know, that sentence requires no

upward departures or variances.  It's still an in guideline

sentence.  And a sentence of this type with a lifetime term of

supervised release reflects the obvious negative psychological

and emotional impacts that this case and these crimes have taken

1   on the victims.

2       You know, Mr. Fautz did violate a position of trust to

3   create these images, and part of that is what makes this kind of

4   such a horrible crime.  And the essential doxing of the victims,

5   with giving their names and identities out across the web, I

6   think, are things that just make this a little more serious than

7   some of the mill-run cases.  So a lifetime term of supervised

8   release is necessary to give the victims and their families some

9   peace of mind.

10      As a condition of the plea that Mr. Fautz agreed to, he

11  agreed not to directly, or through any proxies, attempt to

12  contact the minor victims or their family members during his

13  term of incarceration or his term of supervised release.  And

14  with a lifetime term of supervised release, the Court would be

15  guaranteeing that Mr. Fautz can never again really enter these

16  victims' lives.

17      So for those reasons, the United States believes that a

18  235-month sentence, followed by a lifetime term of supervised

19  release, is sufficient but not greater than necessary to satisfy

20  the considerations of Section 3553(a).

21          THE COURT:  Mr. Mascagni.

22          MR. MASCAGNI:  Judge, the parties worked hard to come

23  up with a binding plea agreement.  The initial threshold would

24  be for the Court to accept it or reject it.  Should the Court

25  choose to reject it, then we'll get a trial date.  Should the

1    Court choose to accept it, then -- if now is the appropriate

2    time, as opposed to hearing whether you reject it or accept it,

3    then I'll go ahead and make some arguments as though you

4    accepted it.  Is that the Court's pleasure?

5            THE COURT:  Well, I am certainly aware of how

6    Rule 11(c)(1)(C) works.

7            MR. MASCAGNI:  Oh, I know that.

8            THE COURT:  I'm interested in your arguments in favor

9    of acceptance of the (C) plea and a sentence consistent with the

10   parties' agreement.

11           MR. MASCAGNI:  Succinctly, Mr. McKiness and I worked

12   on this very hard over the past 13 months.  My client's 40 years

13   of age.  It is rare -- you've been on the bench long enough to

14   know this is an exceptional case in many regards.  The first

15   regard is my client has no prior convictions, has no history of

16   violence, no history of any sexual "predatoric" background.

17       He's 40 years old.  If the Court accepts the sentence, he

18   will leave the penitentiary about 55, 56, 57 years of age a much

19   different man than he was at the time of the commission of the

20   offenses.

21       He's been in custody now for 13 months.  He's had obviously

22   no contact with anyone except me and his family.

23       The Court also -- I will not go into the details, but the

24   Court is aware that he has mental health issues which need to be

25   addressed.  And I was gonna address that, assuming you accept

1  the Plea Agreement and assuming I get to argue for a

2  recommendation, for the Bureau of Prisons placement where he can

3  receive adequate medical and mental health treatment and

4  medications.

5       I brought this up once to the Court during two or three

6  hearings back.  He is not receiving any mental health treatment

7  for the last 13 months.  The medication he was on when he

8  entered the system have not been fulfilled or refilled or

9  prescribed.  As the Court knows, people that have mental health

10 issues need to receive regular mental health treatment and

11 appropriate medication.  So that will be provided best at a

12 federal penitentiary versus a local county jail facility, in my

13 opinion and in my experience over 48 years.

14      Spencer -- Mr. McKiness and I never addressed a lifetime of

15 supervised release.  The Court has done this -- I'm gonna guess

16 for you -- hundreds of times.  I have never had a client in

17 49 years -- 48 years get lifetime supervision.  Courts usually

18 defer to the United States Department of Probation as to needs

19 of the client.

20      So I have to project in the future.  What are his needs

21 confined in an institution, wherever this Court sends him, if

22 you accept the Plea Agreement?  And he'll not have access to

23 computers and hopefully will get, optimistically, the mental

24 health treatment he needs.

25      There's no need for lifetime supervision, whatever the Court

1    thinks appropriate.  I've seen the Court do this at five years

2    or ten years and leave it in the discretion of the United States

3    Office of Probation, and I would recommend that if -- assuming

4    we get through the first two or three steps of this.

5        He has -- despite his interest in these matters, he has been

6    a -- you can't tell 'cause you don't talk to him like I do.  He

7    has been very -- he's very polite, a soft-spoken young man,

8    well-mannered.

9        His parents and I keep in touch consistently.  He's got a

10   very -- fortunate because many clients, as you know, who appear

11   before you don't have a supportive network.  His parents, his

12   family, friends are here to support him and continue to support

13   him and will continue to support him.

14       Mr. McKiness and I worked back and forth over possible

15   negotiations -- binding plea, nonbinding plea, acceptance of

16   responsibility, going from a 36 -- if we went to trial and he

17   was convicted, he would be looking at a 36 or a 39 -- probably a

18   39, based on Shannon Teague's computations and Mr. McKiness and

19   my computations, which would bring him in, you know, roughly the

20   350-month range.

21       So we worked as diligently as we could to come up with this

22   at the high end, which is rare that I think you receive high-end

23   recommendations by counsel for the defense.  You do hear it

24   frequently from the United States government.

25       But taking all things into consideration, the things Spencer

1 said -- Mr. McKiness said, as well as the observation of

2 Ms. Teague in preparation of the PSR, we would just ask the

3 Court to accept the Plea Agreement. And then I'll address the

4 other issues I've reserved in terms of mental health and

5 placement, and that's it. Thank you.

6 THE COURT: Anything further?

7 MR. MCKINESS: Nothing further to argue. The United

8 States is aware that there are several victims that would like

9 to make statements to the Court whenever that's deemed

10 appropriate.

11 THE COURT: Let's do that now, then.

12 J.S.: Hi.

13 MR. MCKINESS: Your Honor, due to the nature of the

14 crimes, the people that speak don't wish to say their names on

15 the record, but the Court has been provided the names of those

16 that will be speaking.

17 THE COURT: Very well. In the transcript we will use

18 initials.

19 MR. MCKINESS: Thank you, Your Honor.

20 J.S.: At first -- excuse me. Sorry -- I wasn't gonna

21 speak today. I felt angry, scared, and anxious about this

22 reality in my life and seeing Jordan Fautz. I have mixed

23 feelings about others knowing that my family was used in these

24 heinous crimes.

25 Another mom whose daughter was targeted and used in these

1  crimes is not permitted to speak today.  Her daughter cannot

2  speak either because she is considered a state victim.  For

3  those that don't know the difference between state and federal,

4  it's the context of the photo.  Any photo that exposed body

5  parts waist down was considered federal; waist up was considered

6  state.  My family photo was state, but one of my daughter's was

7  federal.  So that allowed me to stand here today.

8      After talking with this mom, I considered having the option

9  to speak to the Court and face Jordan Fautz as a privilege

10 instead of a nightmare.  She wants to talk and would be grateful

11 for an opportunity to use her voice for accountability and

12 peace.  Since that conversation, there have been some state

13 victims that have been given the opportunity to speak.  I did

14 not learn that until after I submitted my request to stand here

15 today.  Still, I felt compelled to speak and didn't want to

16 regret doing so.

17     With that said, Jordan Fautz, you stole a family photo of me

18 and my three children from 2022 and turned it into pornography.

19 On February 6th, 2024, three FBI agents sat at my kitchen table,

20 showed me a family photo that you stole, and told me that me and

21 my three children were used in child pornography crimes

22 committed by you.

23     Then I was told there was another photo manipulated by you

24 using just my oldest daughter.  There could be more.  And I've

25 asked and that answer was never given to me.  My children were

1   6, 11, and 12 in that photo.  They were 8, 13, and 14 at the

2   time of their -- of your arrest and when I had to tell my oldest

3   and middle daughters what you did to them.

4        When I got the call from the FBI, I was expecting one of my

5   older daughters to be a victim but not both.  Never did I

6   consider that my baby was used in these crimes.  She was six

7   years old.  She was in first grade.

8        You preyed on my children and used their sweet faces in your

9   demonic crimes for your sick pleasure.  Then you tried to sell

10  them for others who shared this sickness.  You endangered my

11  children by putting them and others in the hands of other sick,

12  twisted predators.

13       You knowingly and intentionally created child pornography

14  using former and current students.  A bomb dropped on our path

15  that was detonated by you.  Although I heard that bombs were

16  being dropped in our community and I was praying that my

17  household wasn't on your list, nothing could have prepared me

18  for that news.

19       You will never have any idea what the following weeks and

20  months were like for us because of your actions.  The entire

21  process, both FBI and St. Stephen Martyr, was surreal and filled

22  with stress and uncertainty.  Knowing we were victims and still

23  having to go to school and community events created anxiety and

24  animosity.  The emails, phone calls, meetings, information,

25  legal proceedings, court reports, and all the people talking

about it, asking what -- asking about it was beyond
overwhelming, but you didn't think about how it would affect the
girls you preyed on and used.  You didn't consider the damage
your actions would have on children, babies.  You didn't care
about how your outrageous behavior would affect numerous
families and their entire life.

The only thing you thought about was yourself.  You only
thought about your perversion.  You only thought about how you
can monetize using the innocence of children.  It's disgusting
and shameful.

My children already had negative memories of you as their
teacher.  They already had stories of inappropriate behavior
exhibited by you in the classroom and at school events.
However, now they have trauma with your name attached to it.
You will be there lurking in their minds and will appear at
different moments of their lives.  For this I resent you and
have hatred in my heart.

I do believe that everything happens for a reason and there
is a lesson in every moment of life.  I'm having the most
difficult time with this aspect.  I pray for guidance and
understanding with this part.  My children did not need a lesson
because of your behavior.  My children did not need to
understand anything deeper by your reprehensible actions.  Why
did they have to be a lesson for you?

As their mother, it is my responsibility to protect my

children.  It is my job to make sure they are safe physically and emotionally.  I could not protect them from you.  They were vulnerable and innocent, and you abused your power and authority as a teacher to commit crimes that will forever be part of their memory.  I have hatred in my heart for you doing that to them.

However, it is also my job to guide and support them on how to process this and not let it destroy any other part of their lives.  I will constantly remind them that this is all on you -- your problem, not theirs.  Nothing they did could have stopped you from doing what you did.  Nothing they could have done would have stopped you from doing what you did.  It had nothing to do with them and everything to do with you and your sickness, your perversion, and your selfishness.

I tell them that you are evil and twisted.  I tell them that the devil does not come dressed in a red cape and pointed horns.  Sometimes he comes dressed as teachers, friends, those we trust so that he can get close to others in attempts to destroy them.  Then I tell them that we should pray for peace in our hearts.  I tell me them that this does not define them and that it should not have any bearing on their perspective about themselves.

Although taking a plea deal and doing your time for these crimes is taking accountability for your decisions and actions, it does not help the embarrassment, anger, disappointment, and shame you caused my children.  It doesn't give them the validation that this was not their fault and that you are sorry

for what you did, truly sorry for what you have caused these girls and their families.

One day you will have to face God and admit your crimes. You will have to ask for forgiveness then and be sincere. He will judge you and decide your penance. You will not be able to lie and manipulate him. That gives me peace in my heart.

I hope you think about what you did to my family and other families every day of your life. I hope you feel deep regret and pain for your actions and what they have caused. I hope you are tormented and haunted knowing how much hatred there is for what you did. I hope you feel deep shame when you read every victim's impact statement and think genuinely about how you affected each of them and their families. I hope those feelings become your rock bottom and you learn from them. Maybe then there is a chance you will never do it again.

When you get out of prison, I pray you have a quiet life and not bother anyone else. I pray that you never cross paths with my children ever again. And if there is some insane chance that you do, I hope they don't notice you and you walk in the opposite direction.

I want my children and every victim of yours to be seen, heard, and understood. I want their feelings to be validated. I want them to have peace in their souls and hearts. I want them to be able to move on and not allowed to create darkness in their lives. They didn't ask for any of this. I hope that one

day you're capable of fully understanding the pain that you caused all these innocent girls and women.

Your Honor, thank you for allowing me to speak today on behalf of my children and the others that were impacted by Jordan Fautz's crimes.

THE COURT:  Thank you.

THE REPORTER:  Would you please state the initials.

MR. MCKINESS:  J.S.  They should be in the order which I sent them to you.

S.S.

S.S.:  There are so many things that I need to say, and I don't know where to begin.  When I was in seventh grade, I was not very well liked by my peers, and I didn't have any friends.  Jordan took advantage of my vulnerability and made me believe that all I needed to rely on was him.

Jordan knew about my past experiences with sexual assault, and that didn't stop him from hurting me.  I talked to Jordan almost every day for around two or three years, and I wasted years of my life believing that all I needed was him.

I have had multiple therapy sessions.  I was put into a mental hospital, visited by the FBI and all in the span of one month.  Never did I think that Jordan, someone I admired and looked up to, would do this to me.

I have nightmares and panic attacks to the point where I throw up, and there were multiple days where I didn't leave my

1  room to eat.  And I didn't sleep for a long time after his

2  initial arrest, and when I would, it would be all day.

3      I have trouble trusting the people closest to me.  I went

4  back to school fearing that maybe somebody else was out to get

5  me.  I changed my clothes in the dark in fear of seeing my own

6  body, and I have grown to hate my body, my image in my mind.

7      When I was taken into the FBI station to confirm that the

8  images he created were me, a part of me died.  I shut my eyes,

9  and I see those photos that you created.  I can run away from

10  this courtroom.  I can run away from this town, but I can never

11  outrun my own mind.

12      I have attempted suicide before, but never in my life have I

13  felt as alone as I have recently.  I understand that I have had

14  countless people, friends, and family there for me, but none of

15  that can fix me.  No amount of money, therapy, or medication

16  would ever make me feel like I deserve to be comfortable in my

17  own skin.

18      I have been bullied, harassed, followed, and outright shut

19  out from the world around me.  I have been sexually assaulted

20  twice, but I have never felt so lost.

21      I remember back when everything happened, my mind was

22  worried about my friends.  I would constantly say that I wish it

23  was just me, all the photos on the internet, because my friends,

24  the people I loved the most didn't deserve to feel the way that

25  I felt.  Children had their innocence stripped off of them by a

religion teacher.

I still hear his voice in my head sometimes or the hands of men on my body. And I feel like no matter where I go, I can never be safe. There are things I feel I could never do. Jordan had edited a photo of me in a dress onto a nude body. I avoided dresses because I felt uncomfortable due to the past experiences I had with sexual assault, and he knew that. I can never wear a dress again. I just wanted to be pretty.

I long for a life where I can live as a normal teenager. I want to go to the mall and hang out with my friends, not sit in court. Normal teenagers don't have the FBI come to their house. Normal teenagers don't get sent to a mental institution, and normal teenagers don't have to stand up in front of a bunch of people they don't even know and point out the man who hurt them.

I want to be a kid again. I will never be the same after this. I feel sick looking at myself in the mirror, disgusted by the way my clothes fit me. The worst part is I will never understand why this happened to me. Why would you want to hurt a child, one that you claimed to love?

Jordan had asked me to live with him after high school. He used to call me pet names like "babe" or "baby," and I just thought he was being caring, which leads to my last point. I was groomed, made to believe that I needed him. I often think to myself that maybe I did something wrong. I shouldn't have responded. I shouldn't have reached out. I shouldn't post on

my Instagram so much.  I shouldn't have put on that dress.  I

shouldn't have allowed this to go on.

I fear -- I feel shame, confusion, and fear, and nobody

should ever have to feel like that.  The things that I want I

cannot have.  I cannot regain my innocence.  I cannot ever look

at myself the same.  No amount of money or medication can fix

that.  My pain is internal, and I don't wish my life upon my

greatest enemies.

Nobody could ever touch upon the way I have felt for the

past year.  The emotional connection that I had to Jordan was

like we were chained together.  No one -- I mean no person on

this planet deserves to feel the way that I do.

I hope that one day I can be truly happy again, and I hope

time serves you well.  I hope that you have the time you need to

understand what you did was wrong.  You hurt me.  You hurt so

many people, and I hope you feel terrible because I do.  And you

never cared about me, and you never loved me.  And you are

disgusting, and I hate you.  I don't deserve this.

L.K.:  I would first like to express my gratitude to

the Court for allowing me to speak today and to extend my

appreciation to the FBI agents, the attorney, and the courts for

their diligent work seeking justice for our victims.

My husband and I are parents of seven children.  Today I

want to discuss the impact Mr. Fautz's actions have had on our

family, particularly focusing on the four youngest children, as

the older three are adults living in other states and have not
been so profoundly affected.

You have received victim impact statements for two of my
children who unfortunately could not be present today due to
their college classes. I hope you have had the opportunity to
read their statements and understand that Mr. Fautz's actions
have held longtime implication on their future.

My daughters have both expressed concerns about potential --
sorry -- potential employers not granting them job interviews
due to the possibility of their employers coming across
compromising photos and assuming they were willing participants
in them. Additionally, they fear for their safety on their
school campuses knowing that individuals who have seen these
photos may not necessarily pose a physical threat, but the
uncertainty still causes them distress.

One of my daughters in particular worries because she
excelled in representing her school in sports, garnishing
recognition on the school's social media page, nonschool sports
websites, and through the state's athletic association. She has
even been scouted out for collegiate-level play, making her
easily identifiable to anyone seeking her out.

This is one of the reasons why she refrained from pursuing
any name, image, and likeness deals, potentially resulting in
the loss of income for her, and the cruelty to recognize the
lasting impact of Mr. Fautz's actions on my daughter's lives,

affecting not only their personal opportunities but their sense of security and peace of mind.

My second youngest child is a senior in high school.  He is my only son, and his experience has been unique compared to the rest of the family.  He has had challenging times during his junior and senior year during the actions of Mr. Fautz.  Instead of focusing on school activities, making memories, and planning for college, he has been consumed by thoughts of what his teacher has done to the people he has known.

He has -- I've witnessed his emotional struggles from tears and anger to moments of silence.  Despite his own pain, he has shown compassion and support to those affected by the situation.  We have had many discussions about the impact of these events on his friends and his disbelief that a trusted teacher could commit such a heinous act.

Our youngest daughter, although not a victim herself, has likely suffered the most within our family.  Like many students, Jordan Fautz was one of her favorite teachers.  She enjoyed his religion class, his shop class that took place after school.  One of the last projects that they worked on in shop class was assembling a basketball goal and setting it in concrete so the kids could play at recess.

She was devastated to learn that her two older sisters were victims of this heinous -- of his heinous acts.  She spent many nights crying over what happened and was shocked to learn that

her favorite teacher would not be there the rest of the school year.

Unfortunately, as the year progressed, it became quite clear that St. Stephen Martyr was not a suitable environment for her to return for her eighth grade year. We spent a significant amount of money having her tested to determine if she was academically prepared to move on to high school, which fortunately she was. While she is excelling academically in high school, socially she misses her friends and the familiarity of her grade school. It has been a challenging period of adjustment for her.

To make matters worse, we have learned from the FBI that Jordan not only created the disturbing images but also included the girls' names with these images. When we discovered that our daughters' names may have been released over the internet, my husband and I made the difficult decision to sell our home and move away. Within four weeks of the FBI's visit, we found a new home, closed on it the following month, and moved that summer.

This transition was incredibly tough on our family, as we had lived in our previous home for nearly two decades. Our children's friends, our neighbors, and the community were all dear to us. Despite the financial hardship, we felt it was necessary for our family's well-being.

It was incredibly challenging for our family when we had made the decision to move from the house that we had called home

for nearly two decades.  Our children had grown up there
surrounded by their friends.  My husband and I had built a life
in the neighborhood that we had loved, a community that had
become a part of who we were, and the fact that we had paid off
our mortgage made the idea of leaving even more daunting.
However, we felt compelled to make the move because we were
unsure who had access to our child's identities and what they
might do if they knew where we lived.

The betrayal we experienced from a teacher who we had known
for over ten years, someone I personally worked with in the
school, shook us to the core.  The decision made by this
individual who we trusted had a ripple effect on our family.

Our daughter lost out on the simple joys of childhood.  Bike
rides with friends until the street lights came on, playing in
the parks, sliding down hills in the snow, the games of
hide-and-seek, ghost in the graveyards, and hours spent on the
swing set with friends are now just memories.  The simple act of
opening the door to her friends asking if she could come out to
play is something that I dearly miss.

It is truly devastating to consider the impact that this one
person's actions and perversions had on numerous lives.  The
overwhelming sense of loss and betrayal we experience is beyond
measure.

As Luke 7:2 states, "It would be better for him if a
millstone were put around his neck and thrown into the sea than

to have him cause one of these little ones to sin."  I am

uncertain if the sentence of 235 months in prison and a lifetime

term of supervision is significant for the harm Mr. Fautz has

inflicted upon his victims.  This decision rests with the

courts.

My hope is that Mr. Fautz seeks repentance for his sins and

that God shows mercy on his soul.  Additionally, I pray that my

family and I can eventually forgive him.  I'd like to thank you

for sharing the time to hear our story.

MR. MCKINESS:  Last one, A.T.

A.T.:  Thank you, Your Honor, for the opportunity to

speak today.  I'm here on behalf of my daughter who has been too

traumatized by what Jordan Fautz has done to her to speak on her

own behalf.  Please do not mistake her absence or the absence of

any of the other victims or their families as indifference.

I want the Court to understand the depth and breadth of the

consequences of Fautz's actions.  My daughter attends college

out of state.  She heard the news of Fautz's arrest alone.  She

learned that she was one of his victims alone.  She's been

forced to process what happened to her alone.

She suffers with the fear that pedophiles to whom Fautz gave

her sexualized images and her real name will seek her out and do

her harm.  Like many of these young girls, women, and their

families, my daughter has been dealing with feelings of shame,

guilt, humiliation, and embarrassment despite having done

1    absolutely nothing wrong.

2        While these feelings will hopefully ease with the passage of

3    time, the most insidious part of Fautz's crimes will linger.  He

4    destroyed the foundation on which my daughter built her life.

5    He was allowed to hide in plain sight under the protection of

6    those who chose to ignore the red flags.

7        Fautz ingratiated himself into the tight-knit community from

8    which he himself came.  He gave us pet names.  Mine was

9    "Amandar."  He would say things like, "Well, if I were doing any

10   better, I'd be me."  What a lie.  This is that mild-mannered

11   person that Mr. Mascagni wants you to think he is.

12       What Fautz projected as genuine kindness and caring was just

13   grooming.  It was a lie.  His actions were carefully calculated,

14   not to teach my children or to care for them as I thought, but

15   to take advantage of them in the most disturbing and perverted

16   ways.  He used the most precious and dear person in my life for

17   his own disgusting gain.  The person I so carefully raised and

18   ferociously protected, he removed her clothes, and he made her

19   nude for the whole world to see.  He abused her.

20       Fautz's use of religion as a shield for his pedophilic

21   activities has forever changed the way in which all three of my

22   daughters view the role of God and religion in their lives.  The

23   person who was supposed to help them in their faith journey

24   weaponized it.  While they were looking to him for religious

25   answers and guidance, he was looking at them as human currency

1    to sell or trade on the dark web.  How do you move past that?

2    The answer is simple.  You don't.  My daughters are forever

3    changed, and my family is forever changed.

4        We've been advised that 235 months is a significant amount

5    of time for these crimes.  Without diminishing the incredible

6    efforts of the dedicated personnel at the FBI and the U.S.

7    Attorney's Office, the fact of the matter is that no time is

8    enough to punish Fautz for what he's done to my child.  She will

9    always bear the scars of his crime.

10       She will live the rest of her life knowing that her images

11   are in the database of the National Center for Missing and

12   Exploited Children and that she may be called because another

13   pedophile has been found with her images.  That call could come

14   at any time -- the day she graduates from college, on her

15   wedding day, at the birth of a child.  The other shoe will

16   always be poised to drop again and again and again.

17       My daughter will always be worried that someone who has seen

18   these sexually explicit pictures of her may be lurking in the

19   shadows to do her harm.  She will always have to explain this

20   story to potential employers, close friends, significant others

21   because it may rear its head when she least expects it.  She

22   will never be free of what he's done to her even after his

23   235-month sentence is up.

24       Fautz is the only person in this room who had a choice.  My

25   daughter didn't have a choice and neither did any of these

1  victims or families.  Fautz chose to exploit my daughter.  He

2  chose to put everyone in danger.  He chose to hurt them, and for

3  those choices that he so freely made, he deserves to be behind

4  bars for as many years as the justice system will allow.  Thank

5  you.

6          MR. MCKINESS:  Those are all the people that have

7  indicated that they wish to speak today.

8          THE COURT:  Thank you.  Anything further from the

9  United States?

10          MR. MCKINESS:  Not on this issue, Your Honor.

11          THE COURT:  Mr. Mascagni, anything further?

12          MR. MASCAGNI:  Either to be addressed now or after the

13  Court makes its declaration as to whether or not the Plea

14  Agreement is accepted by the Court, I reserve until I hear that

15  opinion, please.

16          THE COURT:  I have studied the Presentence

17  Investigation Report.  I have carefully considered the factors

18  set out by Congress in Title 18 of the U.S. Code at

19  Section 3553(a).  I have carefully considered the submissions of

20  counsel, and I will accept the parties' Rule 11(c)(1)(C) Plea

21  Agreement and sentence accordingly.

22      There you go.  You have my ruling now.

23          MR. MASCAGNI:  Judge, I assume we're now

24  metamorphosing into remarks that need to be made as though you

25  have made your determination and reached the decision, which it

1   has.

2        You know, you -- it was very, very troubling testimony we

3   just heard.  I have an attorney-client privileged relationship

4   with my client, and I will tell the Court that in our private

5   communications and our private interactions, I stand by what I

6   said despite what I've just heard.  Of course, a man presents to

7   you the way a man presents to you.

8        These type of crimes are crimes of individual privacy.  His

9   whole family, including his wife, the first they heard of these

10  activities on the computer is when their son and their husband

11  got arrested.  I have spoken with them at length, the mother and

12  father, for the past 13 months.  I am moved by the impact that

13  it has on aging parents who may not live to see their son

14  released from the penitentiary at the 235-month level.  So this

15  is a very complex situation with his family, his friends, his

16  parents, and his wife.

17       The other factors that need to be addressed are economics.

18  As Ms. Teague put in the report, he is indigent.  He has no

19  money, no resources.  If the Court were to impose financial

20  things, he will not have the ability to pay them.  In addition

21  to being unemployed for 13 months, he's gonna be unemployed for

22  the next 20 years, give or take.  So that's really not an item I

23  think the Court needs to address, other than the reality of the

24  noneconomic situation which the defendant finds himself.

25       Number two is placement.  I've already addressed it

peripherally.  You have read parts of the PSR that have not been
addressed here in court today relative to his mental health.  I
explained to Mr. McKiness, I'm gonna say, five times over the
past 13 months that I was concerned about my client's ability to
adapt to being plucked out of society and placed in a foreign
situation with -- as the Court knows, these are sensitive
charges, not only to the public here at large but to the other
inmates where he is housed and will be housed.

There's a representative demarcation of crimes in the
institution, which the Court knows.  I may know it a little bit
better only because I've represented clients prior to their
entry into the federal system and out and their experiences in
the institution itself.

He needs to be -- in my opinion, in reviewing the various
institutions close surrounding the Louisville area -- and I made
phone calls to Lexington medical center 'cause you and I had a
client many, many years ago, the Air Force pilot -- you may or
may not remember.  He went -- he was -- went to Lexington, which
primarily, as you know, the history was medical.  Then it
expanded to mental health issues.  Then it expanded coed,
noncoed, various metamorphosis over the last several decades.

My client who went there did enjoy the privilege of mental
health treatment by a real psychiatrist on a regular basis.  And
a psychiatrist, as you know, is a DMD [verbatim], and they can
prescribe medications.  As the Court also knows, medications and

1    the regimen of medications change over the years depending on

2    how well the patient adapts.

3        I would recommend strongly to the Court -- and I talked with

4    Ms. Teague, and she put it in the report, in the PSR -- that he

5    be sent to an institution not where he's just housed but housed

6    where he can receive medical and mental health treatment.  And

7    my opinion is that can best be provided at Lexington.  I do not

8    know if they will accept him.

9        Dr. Patel was in a training at the time -- my last phone

10   call with him earlier this week to see whether or not -- not

11   only -- of course, I guess they have no choice, other than a

12   rejection of a DOC recommendation or binding imprisonment.

13       And I would ask for his good and the good of all the

14   community that -- these issues that he has needs to be addressed

15   professionally, not just by housing.  And I know the Court

16   cannot bind the Bureau of Prisons, but I'd ask that you put in

17   that recommendation based on things discussed today as well as

18   things contained in the -- about his mental health in the PSR

19   and make that recommendation on his behalf.

20       We went back and forth.  This, I think, is the only

21   second -- second largest binding plea agreement I've given since

22   the United States Sentencing Guidelines came into effect, I

23   think, November 1 of '77.  So that's a long time.  That's over

24   40 -- 40 years plus.

25       I did so and made that recommendation as his counsel.  And,

1   of course, we had many, many discussions about it, about going

2   to trial, about entering a plea without a plea agreement at all.

3   And based on the exposure that he had by going to trial, adding

4   up another three points, the decision was made.  And he's agreed

5   with me that he would give me the authority to advise the Court

6   he would accept that binding Plea Agreement should the Court

7   accept it.  This was not done haphazardly.  It was done over

8   hours and hours of discussion and review.

9        So I would ask the Court in summary to sentence him to the

10  institution for 235 months, a limited period of supervision

11  because he'll be -- I've already said it -- approaching 59 years

12  of age and a different man when he is released from the

13  institution and five years, ten years of supervised release.

14       So let the then new probation officer, when you and I will

15  be gone from here -- maybe not from the planet earth, but from

16  the practice of law 20 years from now -- and let them make an

17  assessment of the man that presents to them as their initial

18  probationer.  On behalf of his family and him, we thank the

19  Court for your time.  Thank you.

20            THE COURT:  Thank you.  And, Mr. Mascagni, does

21  Mr. Fautz wish to address the Court, which is of course his

22  right?

23            MR. MASCAGNI:  Judge, we discussed that prior to

24  coming here, and he's elected not to address the Court but let

25  me speak on his behalf.

1          THE COURT:  Thank you.  Anything else from the United

2    States?

3          MR. MCKINESS:  Your Honor, I think we addressed in our

4    sentencing memo restitution and the fines and assessments, and

5    there's been a preliminary order of forfeiture that's been

6    filed.  So I don't believe there's anything else to address.

7          THE COURT:  Anything else, Mr. Mascagni?

8          MR. MASCAGNI:  No, Your Honor.

9          THE COURT:  Are the parties ready for me then to state

10   the sentence?

11         MR. MCKINESS:  Yes, sir.

12         MR. MASCAGNI:  Yes, sir.  You want us at the podium,

13   Your Honor?

14         THE COURT:  That's probably best.  Thank you,

15   Mr. Mascagni.

16         MR. MASCAGNI:  Yes, sir.

17         THE COURT:  First, let me acknowledge the large number

18   of people that are here, which of course speaks to the impact of

19   this case.  Cases like this are impactful, as has been so

20   eloquently stated, well beyond the courtroom.  And so to those

21   who spoke, I want to acknowledge your courage and thank you for

22   speaking here today.  My hope for you and all of the victims

23   represented here today is ultimately healing and peace.

24      I have carefully considered, as I've previously stated, the

25   submissions of counsel.  I've carefully considered the parties'

1　(C) Plea Agreement and the information and facts I heard during

2　the course of the change of plea hearing.  I have carefully

3　considered the Presentence Investigation Report.  I've

4　considered the guidelines and their recommendations, and I have

5　considered the sentencing factors set out by Congress in

6　Title 18 of the U.S. Code.  I will now impose the following

7　sentence:

8　　　It is the judgment of the Court that the defendant,

9　Jordan A. Fautz, is hereby committed to the custody of the

10　Bureau of Prisons for a term of 235 months as to each of

11　Counts 1 through 7 in the Superseding Indictment, which shall be

12　served concurrently for a total term of 235 months'

13　imprisonment.

14　　　Upon release, the defendant shall be placed on supervised

15　release for a term of 30 years as to each of Counts 1 through 7

16　in the Superseding Indictment, which shall be served

17　concurrently for a total term of 30 years.

18　　　While on supervised release, the defendant shall abide by

19　the standard conditions of supervision adopted by the Court as

20　well as the special conditions that have been detailed in Part G

21　of the PSR.  These special conditions include drug testing,

22　mental health treatment, specific sex offender conditions, sex

23　offender treatment, computer monitoring, being subject to

24　searches, being subject to polygraph and other similar testing,

25　registration as a sex offender and, of course, no contact with

1    any victim.  The U.S. Probation Office will answer any questions

2    that the defendant may have regarding these requirements.

3        The defendant is also required to pay a special penalty

4    assessment fee of $100 per count for a total here of $700.  It

5    is further ordered that the defendant is responsible to pay

6    restitution in the amount of $28,130.  That's $5,130 for Minor

7    Victim 1, $3,000 for Minor Victim 2, and $10,000 each to Minor

8    Victims 3 and 4.  Interest is waived.

9        The defendant is found to be indigent and, therefore, the

10   otherwise applicable special assessment per the Justice for

11   Victims of Trafficking Act of 2015 is waived.  A fine and

12   associated costs are waived in lieu of the restitution

13   obligations.

14       I have carefully considered the history and characteristics

15   of the defendant, which have been discussed at length here

16   today.  I have also considered the nature and circumstances of

17   the offenses here.

18       The offense conduct admitted to by the defendant and

19   documented in the PSR is shocking and detestable.  The defendant

20   possessed and distributed hundreds of images of horrifying child

21   sexual exploitation.  He brazenly utilized his employer's IP

22   address when committing those crimes.

23       The possession and distribution of child exploitation images

24   alone would justify a significant sentence, as suggested by the

25   sentencing guidelines, but the defendant also admitted to a

1    still more heinous abuse of his position at a local middle

2    school.  He utilized computer software and applications to morph

3    innocent photos of students and others into explicit videos

4    depicting the sexual exploitation of underage children.  He

5    distributed those images.

6        And if that exploitation and abuse of his position as a

7    teacher wasn't enough, the defendant included in his

8    distribution of these dreadful images the personal information

9    of some of his victims.  These details regarding the full scope

10   of the defendant's heinous actions clearly justify a sentence at

11   the upper end of the recommended guideline range and also

12   justify a significant term of supervised release to follow.

13       As I outlined at the outset of this hearing, the guidelines

14   produce a total offense level of 36 against a criminal history

15   category of I, resulting in a guideline range as recommended of

16   between 188 and 235 months' imprisonment, a fine range of 40,000

17   to 400,000, and a range of supervised release of between five

18   years up to life.

19       As to the other sentencing factors, I conclude that this

20   sentence properly reflects the seriousness of the offenses of

21   conviction.  It will promote respect for the law.  It will

22   provide just punishment, and it will afford adequate deterrence.

23       Having accepted the parties' (C) Plea Agreement, I conclude

24   that this sentence of 235 months in custody, followed by

25   30 years of supervised release, is sufficient but not greater

1    than necessary to comply with the purposes set forth in

2    Section 3553(a)(2).  It satisfies the applicable statutory

3    provisions.

4        Are there any objections now to the sentence pronounced or

5    the special conditions imposed which have not previously been

6    raised?

7            MR. MCKINESS:  Not from the United States, Your Honor.

8            MR. MASCAGNI:  No, Your Honor.

9            THE COURT:  Let's now discuss Mr. Fautz's appeal

10   rights.  I believe, if I recall correctly, Mr. McKiness, that

11   the parties' (C) Plea Agreement includes an appeal waiver; is

12   that correct?

13           MR. MCKINESS:  That is correct, Your Honor.

14           THE COURT:  And so, Mr. Fautz, you may recall from

15   your change of plea hearing we discussed how, in exchange for

16   the concessions made in your Plea Agreement, you agreed to waive

17   your right to appeal your guilty plea, conviction, or the

18   sentence that I just imposed here today.  Do you recall that?

19           THE DEFENDANT:  Yes, sir.

20           THE COURT:  There are only two exceptions to your

21   appeal waiver, those being appeals based upon a claim of

22   ineffective assistance of counsel or a claim based upon

23   prosecutorial misconduct.

24       Now, appeal waivers of this type are generally considered

25   valid, but if you believe yours is invalid, you may present that

1    theory to the Court of Appeals, and you may appeal on the basis

2    of either or both of the two exceptions I just mentioned.

3        To do so, you must first file a notice of appeal.  That must

4    be done within 14 days of the entry of judgment.  If you need

5    the assistance of the clerk's office in filing that notice, they

6    will upon request assist you.

7        If you cannot afford the filing fee, you may ask that it be

8    waived.  And if you cannot afford counsel on appeal, you may ask

9    that counsel be appointed to represent you free of charge.  Do

10   you understand your appeal rights as I've outlined them for you?

11           THE DEFENDANT:  Yes, Your Honor.

12           THE COURT:  Anything further with respect to

13   Mr. Fautz's Rule 32 rights that we need to cover, Mr. Mascagni?

14           MR. MASCAGNI:  No, Your Honor.

15           THE COURT:  You had earlier talked about a judicial

16   recommendation to be included in the judgment with respect to

17   placement for Mr. Fautz.

18           MR. MASCAGNI:  Yes, sir.

19           THE COURT:  Mr. Fautz, just so that you understand,

20   the law does not afford me the authority to order the Bureau of

21   Prisons to place you or anyone else in any specific institution

22   or in any program within an institution.  The law gives that

23   authority generally to the U.S. Department of Justice and the

24   Bureau of Prisons.  I understand, though, through long practice

25   that the Bureau of Prisons does follow judicial recommendations

1   whenever possible.

2      I do not -- as a matter of best practice, I do not recommend

3   specific facilities, but what I will do here, having read the

4   PSR, I will recommend that the Bureau of Prisons, Mr. Mascagni,

5   evaluate Mr. Fautz for appropriate placement.  It's my

6   understanding they will do that as a matter of course in every

7   single case anyway, but I will -- I find it reasonable here,

8   based upon what I read about him in the PSR, to make that

9   recommendation.

10     Anything else by way of judicial recommendation you would

11   request be included in the judgment?

12         MR. MASCAGNI:  Just one second, Your Honor.

13     (Mr. Mascagni conferring with defendant off the record.)

14         MR. MASCAGNI:  No, Your Honor.  Thank you for the

15   consultation time.

16         THE COURT:  Anything further from the United States?

17         MR. MCKINESS:  No, sir.

18         THE COURT:  Anything further, Mr. Mascagni?

19         MR. MASCAGNI:  No, Your Honor.

20         THE COURT:  Mr. Fautz will be remanded to the custody

21   of the Marshals Service, and we'll be adjourned.  Thank you.

22     (Proceedings concluded at 3:26 p.m.)

23

24

25

1          C E R T I F I C A T E

2      I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

3   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4

5
         _____s/Dena Legg_____          _April 23, 2025_
6   Certified Court Reporter No. 20042A157     Date
    Official Court Reporter
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25